IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

V.                                                     Case No. 14-CR-01667-KG

ROBERTO REYES,

     Defendant.

## MEMORANDUM OPINION AND ORDER

On November 5, 2014, Defendant filed a Motion to Suppress wherein he seeks to suppress physical evidence seized from his home by Lincoln County Sheriff's Office without a warrant on January 8, 2014. (Doc. 53). On November 25, 2014, I held an evidentiary hearing on the Motion to Suppress. Present at the hearing were Luis Martinez and Selecia Winston, Assistant United States Attorneys, and Mary Stillinger, counsel for Defendant. Having considered Defendant's Motion to Suppress, the corresponding briefs, the evidence of record, and the argument of counsel at the November 25, 2014, hearing, I hereby GRANT Defendant's Motion to Suppress.

## FINDINGS OF FACT

1. At the November 25, 2014, suppression hearing, the United States presented the testimony of three officers from the Lincoln County Sheriff's Office who were present at Defendant's residence, 821 Carrizo Canyon Road, Ruidoso, New Mexico, on January 8, 2014, and participated in the search and seizure.

     a. The first witness to testify was Lincoln County Sheriff Robert Shepperd (Sheriff Shepperd). Sheriff Shepperd has been with the Lincoln County Sheriff's Office for

approximately fifteen years, including thirteen years as a Deputy and two years as Sheriff.  *See*

Mot. to Suppress Hr'g Tr. 6, November 25, 2014.[1]

       b.  The second witness to testify was Deputy Sheriff Kevin Kennedy (Deputy

Kennedy) who has been employed with the Lincoln County Sheriff's Office for fifteen months.

*Id.* at 61.

       c.  The third witness to testify was Deputy Sheriff Matt Christian (Deputy

Christian) who has been employed with the Lincoln County Sheriff's Office for two years.  *Id.* at

76.  Deputy Christian also has an additional ten years of law enforcement experience.  *Id.*

    2.  Defendant also testified on his own behalf.  *Id.* at 105-26.

    3.  On January 8, 2014, the Lincoln County Sheriff's Office was actively searching for a

known violent fugitive identified as Aaron Ramos (Ramos).  *Id.* at 7-8.  The Lincoln County

Sheriff's Office had information that Ramos was possibly in possession of an AK-47 rifle and

usually was accompanied by his bodyguard, an individual identified as Danny Boyd or Danny

Rios (Boyd-Rios).  *Id.* at 8.  It was also believed that Boyd-Rios was a suspect in two armed

robberies in the Ruidoso area and that Boyd-Rios had made numerous statements that he would

shoot and kill law enforcement if they attempted to apprehend him.  *Id.* at 8.

    4.  In the afternoon on January 8, 2014, Deputy Sheriff Brack Rains (Deputy Rains) of

the Lincoln County Narcotics unit received a tip that Ramos was hiding in a house located at 819

Carrizo Canyon Road, Ruidoso, New Mexico.  *Id.* at 7, 9-10.  That same day, a team of law

enforcement officers, including officers from the Lincoln County Sheriff's Office, arrived at the

address.  They came in contact with the homeowner of 819 Carrizo Canyon Road and requested

---

[1]  The Court's citation, "Tr." refers to the court reporter's original, unedited version of the transcript of the Motion to
Suppress hearing.  Any final transcript may contain slightly different page and/or line numbers.

permission to enter the residence to conduct a search.  *Id.* at 10.  The homeowner of 819 Carrizo

Canyon Road consented to the search.  *Id.*

     5.  Deputy Rains, Deputy Christian, and an officer identified as Deputy Hatcher

conducted the search.  *Id.* at 91; Gov't Ex. 11 at 4:10-7:22.  The officers were dressed in plain

clothes and raid vests with lettering conspicuously on their chests and back identifying

themselves "SHERIFF" or "POLICE," and were armed.  Gov't Ex. 11 at 4:10-7:22.  The officers

cleared the residence within approximately three minutes without discovering Ramos.  *Id.*; Tr.

13-14, 19.

     6.  During the search, Sheriff Shepperd stationed himself behind 819 Carrizo Canyon

Road, providing security for the three officers conducting the search inside.  Tr. 10.  Sheriff

Shepperd also was dressed in plain clothes and wearing a raid vest with lettering on his chest and

back identifying himself as "SHERIFF."  *Id.* at 21.

     7.  As the search was underway, Deputy Kennedy and two other unidentified officers

arrived at the scene.  *Id.* at 19.  Deputy Kennedy and one unidentified officer were dressed in

uniform.  *Id.* at 21; Gov't Ex. 11.  The other unidentified officer was dressed in plain clothes

without a raid vest.  Gov't Ex. 11.

     8.  After the search, Deputy Rains spoke with several neighbors to determine if the

neighbors had noticed any individuals or cars at 819 Carrizo Canyon Road.  Tr. 14; Gov't Ex. 10

at 8:51-9:56.  The neighbors confirmed that the residence being searched was in fact 819 Carrizo

Canyon Road.  Gov't Ex. 10 at 8:51-9:56.

     9.  Simultaneously, Sheriff Shepperd conducted a perimeter sweep of 819 Carrizo

Canyon Road and observed a dog run from the perimeter of 819 Carrizo Canyon Road to the

front door of 821 Carrizo Canyon Road, which is located next door to 819 Carrizo Canyon Road.

Tr. 15-17. Sheriff Shepperd believed that the dog resembled Ramos' dog, which was impounded after an earlier search of Ramos' home in Ruidoso, New Mexico. *Id.* at 16-17. To Sheriff Shepperd's knowledge, no one had claimed the dog from the animal control center. *Id.* at 46.

10. Based on this observation, Sheriff Shepperd decided to speak to the residents of 821 Carrizo Canyon Road to inquire into any suspicious activity at 819 Carrizo Canyon Road. *Id.* at 15-16. Sheriff Shepperd holstered his firearm and told Deputy Kennedy to accompany him to 821 Carrizo Canyon Road. *Id.* at 20, 39, 71-72; Gov't Ex. 11 at 10:13.

11. To access the front door of 821 Carrizo Canyon Road, Sheriff Shepperd and Deputy Kennedy walked up ten stairs to an elevated porch. Gov't Ex. 3. The front door of the residence was located on the opposite end of the long porch. Gov't Ex. 2. The porch was cluttered with several items, including a mattress leaning against the wall of the house. Gov't Ex. 4. Despite the clutter, Sheriff Shepperd, Deputy Kennedy, and other officers were able to move around the porch. *Id.*; Gov't Ex. 11.

12. Sheriff Shepperd approached the front door while Deputy Kennedy stood a couple feet behind Sheriff Shepperd. Tr. 20-21, 72. Deputy Kennedy was holding a department-issued shotgun. *Id.* at 21. Sheriff Sheppard knocked at least once, possibly twice. *Id.*

13. Both Sheriff Shepperd and Deputy Kennedy heard music from inside the home. *Id.* at 21, 64. At that time, Deputy Kennedy was standing adjacent to a large kitchen window. *Id.* at 20-21, 64. A refrigerator located inside the residence blocked approximately two-thirds of the kitchen window. *Id.* at 108, Gov't Ex. 11 at 11:58, 12:08, 12:15, 13:39-13:40. Deputy Kennedy recalled the view through the window was obstructed with a curtain. Tr. 64. Nonetheless, Deputy Kennedy could see partially into the home through the kitchen window. *Id.*

14.   Immediately after Sheriff Shepperd knocked, Defendant appeared at the kitchen window.  *Id.* at 21-22, 65, 108-09.  Deputy Kennedy raised his shotgun, pointed it directly at Defendant and loudly ordered him, "Hey, open the door!"  Gov't Ex. 10 at 10:41-10:44; *Tr.* 21, 65, 108-110.

15.   Upon hearing Deputy Kennedy, Sheriff Shepperd turned around and observed Deputy Kennedy pointing his shotgun at Defendant.  Tr. 21-22.  Sheriff Shepperd told Deputy Kennedy to lower his shotgun.  *Id.* at 22, 65.

16.   Defendant immediately opened the door and stepped out onto the porch.  *Id.* at 23, 65, 111; Gov't Ex. 11 11:53.  Sheriff Shepperd said, in a non-threatening tone, "Sheriff's Department" and proceeded to ask Defendant several questions, including whether the dog that ran to Defendant's door belonged to him and whether other individuals were present in Defendant's home.  Gov't Ex. 10 at 10:53, 11:03; Tr. 22-23.  Defendant informed Sheriff Shepperd that it was his dog and he was the only individual in the home.  Tr. 22-23.  Sheriff Shepperd also inquired into whether 821 Carrizo Canyon Road was Defendant's home.  *Id.* at 23.  Defendant stated that 821 Carrizo Canyon Road belonged to Defendant's aunt, but Defendant was staying at the residence while he completed some construction on the home.  *Id.*  Sheriff Shepperd also asked Defendant if he had identification.  *Id.* at 25.  In response, Defendant readily produced his driver's license from his wallet in his back pocket.[2]  *Id.* at 111.

17.   Sheriff Shepperd informed Defendant that they were searching for Ramos and asked Defendant whether he knew Ramos.  *Id.* at 23, 67.  Defendant stated that he did not know Ramos.  *Id.*  When Sheriff Shepperd repeated the question, Defendant responded that he knew of Ramos, but avoided Ramos.  *Id.* at 25.  Based on these inconsistent statements Sheriff Shepperd

---

[2]  Sheriff Shepperd testified that Defendant went inside the residence to retrieve his identification.  The video record does not support this testimony.  Gov't Ex. 11 at 11:18-12:13.

suspected that Ramos was inside the home.  *Id.* at 24-26.

18.    During the exchange between Sheriff Sheppard and Defendant, Deputy Kennedy remained standing approximately three feet behind Sheriff Shepperd.  *Id.* at 21, 36; *see also* Gov't Ex. 11 at 11:53-11:59.  Deputy Kennedy testified he kept his shotgun in a "low-ready" position, which he explained was at a forty-five degree angle pointing downward toward the ground.  *Id.* at 68, 74; *see also* Gov't Ex. 11 at 11:53-11:59.  The video record illustrates that at least for a few moments, Deputy Kennedy held the shotgun with the barrel parallel to the floor, not in a low-ready position.  Gov't Ex. 11 at 12:08-12:10; Tr. 74.  The video record also illustrates Deputy Kennedy pointing the shotgun in the immediate direction of Defendant and Sheriff Sheppard.  Gov't Ex. 11 at 12:08-12:10.

19.    Additionally, Deputy Rains, Deputy Christian, and Deputy Hatcher started walking toward the porch stairs of 821 Carrizo Canyon Road.  Gov't Ex. 11 at 11:18-11:53.  The officers were still brandishing their department-issued guns, but were either carrying the guns in a low-ready position or in one hand.  *Id.*

20.    Due to Defendant's inconsistent statements regarding Ramos, Sheriff Shepperd asked, "Can I take a look?"[3]  Gov't Ex. 11 at 12:12; Tr. 25, 78-79.  Defendant stated, "Yeah, come in."  Gov't Ex. 10 at 11:42; Gov't Ex. 11 at 12:13.

21.    Approximately sixty-one seconds elapsed from when Deputy Kennedy ordered Defendant to open the door and when Defendant agreed to the search.  Gov't Ex. 10 at 10:41-11:42; *see also* Gov't Ex. 11 at 10:13-12:13 (time between Sheriff Shepperd ordering Deputy Kennedy to accompany him to 821 Carrizo Canyon Road and when Defendant agreed to the search).

---

[3]  Sheriff Sheppard testified that he asked Defendant for consent at least twice.  Tr. 25-26.  This testimony is uncorroborated, however.  A close review of both the audio and video record reveals he asked Defendant once.  Segments of the audio exhibit are inaudible.

22.   At the moment Defendant agreed to the search, Deputy Rains, who also was on the porch, walked past Deputy Kennedy and approached Sheriff Shepperd and Defendant.  Gov't Ex. 11 at 12:11-12:13.  Deputy Christian and Deputy Hatcher were on the ground below the porch where Defendant and Sheriff Shepperd were standing.  *Id.* at 12:12-12:14.

23.   One second after Defendant agreed to the search, Deputy Rains waived for Deputy Christian and Deputy Hatcher to enter the home.  *Id.* at 12:14.  Within five seconds, Deputy Rains and Sheriff Shepperd entered the home.  *Id.* at 12:15; Gov't Ex. 10 at 11:44.  Deputy Christian and Deputy Hatcher entered the home approximately twenty-five seconds after Defendant agreed to the search.  Gov't Ex. 11 at 12:13-12:38.  Deputy Kennedy remained on the porch, entering the home within moments to assist another officer.  *Id.* at 13:05-13:09; Tr. 68.

24.   Upon entering the home, Deputy Christian observed a sawed-off shotgun laying in plain view on a counter.  Gov't Ex. 11 at 12:48-12:50; Tr. 82.  Deputy Christian asked Defendant, "This your sawed-off, Roberto?"  Gov't Ex. 11 at 12:54-12:57.  Defendant responded, "Yes sir."  *Id.* at 12:57; *Tr.* at 69.  Deputy Hatcher then escorted Defendant out of the home and onto the porch.  Gov't Ex. 11 at 12:39-13:12.  Shortly thereafter, Deputy Hatcher placed Defendant in handcuffs.  *Id.* at 14:35.

25.   Sheriff Sheppard searched the upper level of the home.  *Id.* at 12:37-13:12.  Immediately after Sheriff Shepperd completed his search of the upper level, he informed Deputy Christian that the home had a lower level.  *Id.* at 13:10.  Deputy Christian proceeded to search the upper level of the home.  *Id.* at 13:10-14:45.

26.   After searching the upper level, Deputy Christian searched for the entrance to the lower level of the home.  *Id.* at 14:45-15:30.  While Deputy Christian was searching for the entrance, he encountered an unidentified officer who was standing outside the house casually

tending to a dog.  *Id.* at 15:11-15:25.  Shortly thereafter, Deputy Kennedy approached Deputy Christian and an unidentified officer, and the three officers had a brief inaudible conversation regarding Deputy Rains and his location.  *Id.* at 15:26-15:28.

27.  Defendant informed Deputy Rains that the house belonged to Defendant's aunt. Gov't Ex. 10 at 15:09.  Shortly after Defendant's statement, Deputy Rains and Sheriff Shepperd reentered the upper level of the home with Defendant and questioned Defendant about Ramos' whereabouts.  Gov't Ex. 11 at 16:00-16:14.

28.  Deputy Christian reentered the home from the front porch, located the stairs to the lower level, and commenced searching the lower level.  *Id.* 16:16-17:59.  Deputy Christian searched under mattresses, behind doors, and in enclosed and non-enclosed closets.  *Id.*  Deputy Christian also looked inside small containers and shelving units, in which he discovered ammunition.  *Id.* at 16:50-17:20; Tr. at 95.  Deputy Christian then returned to the upper level of the home.  Gov't Ex. 11 at 17:59-20:26.

29.  While Deputy Christian searched the lower level, Deputy Rains informed the officers on the upper level that Ramos was not on the premises, Gov't Ex. 10 at 16:41-16:42, stating "He's not here.  House is clear.  Matt's [Christian] down there [lower level]."  *Id.* at 16:41-17:27. Deputy Rains' statement is the first time any officer stated that an area of the house or the house itself was secured.  Deputy Rains' statement occurred approximately four minutes and fifty-nine seconds after Defendant consented to the search.  Gov't Ex. 10 at 11:42-16:41.

30.  As Deputy Christian reentered the upper level, the following exchange took place between Defendant, Deputy Rains, and Sheriff Sheppard:

> Defendant:  [Do you have a] "warrant to be in here?"  *Id.* at 17:30; Tr. at 116-17;

8

Deputy Rains:  "Warrant?  You consented for us to come in here."  Gov't Ex. 10 at 17:32-17:36;

Sheriff Shepperd:  "I asked if I could search here for Ramos."  *Id.* at 17:36-17:39; Gov't Ex. 11 at 18:09-18:12;

Defendant:  "I never said a damn thing."  Gov't Ex. 10 at 17:39;

Deputy Rains:  "Really partner, I got it recorded.  It's all good."  *Id.* 17:40-17:42;

Defendant:  "When you got someone pointing a gun at you, yeah you do."  *Id.* at 17:46-17:49; Gov't Ex. 11 at 18:20;

. . .

Defendant:  "I never gave you nothing.  I had a gun pointed at me man."  Gov't Ex. 10 at 18:23-18:26.

31.  After this exchange, Deputy Christian searched the upper level of the home again while Deputy Rains and Sheriff Shepperd stood at the front door with Defendant.  Tr. 96-97; Gov't Ex. 11 at 18:09-19:45.

32.  During this second search of the upper level, Deputy Christian entered the kitchen and opened a lower corner cabinet door and discovered marijuana and a digital scale.  Tr. 85; Gov't Ex. 11 at 19:35-19:45.

33.  An unidentified officer told Deputy Christian, "We need a search warrant."  Gov't Ex. 11 at 19:46-19:47.  Deputy Christian continued to search the upper level until Deputy Christian was told a second time that the officers needed a search warrant.  *Id.* at 19:47-20:27.

34.  Approximately eight minutes and fourteen seconds passed from when Defendant consented to the search to the time Deputy Christian ceased searching.  *Id.* at 12:13-20:27.

9

35.  The officers later conducted a search of 821 Carrizo Canyon Road and discovered the methamphetamine.  *Id.* at 30, 86-87.

PROCEDURAL BACKGROUND

On May 14, 2014, a grand jury charged Defendant with felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), possession of an unregistered firearm under 26 U.S.C. §§ 5861(d), 5871, and 5845(a), possession of a firearm with an obliterated serial number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B), intentionally possessing with intent to distribute five kilograms and more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(a), and aiding and abetting under 18 U.S.C. § 2. *See* (Doc. 23).  Defendant now moves the Court to suppress all physical evidence seized from his home on January 8, 2014.

Defendant makes two primary arguments to suppress the evidence.  First, Defendant argues that the Lincoln County Sheriff Officers unlawfully seized Defendant in his home on January 8, 2014.  Second, Defendant contends the taint of the initial Fourth Amendment violation was not removed prior to Defendant's consent, and, accordingly, Defendant's consent was not freely and voluntarily given.

DISCUSSION

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."  U.S. Const. amend. IV.  In order for the Fourth Amendment to apply, a person must have a reasonable expectation of privacy in the area to be searched.  *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).  The United States does not contest that Defendant had a reasonable expectation of privacy in the home.  I will treat the house and porch as constitutionally protected

areas for Fourth Amendment purposes. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414-15 (2013)
(holding that curtilage of home, including front porch, is constitutionally protected area).

Where the Fourth Amendment applies, a warrant is generally required before an officer
may search or seize a person or her property. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219
(1973). This requirement is, of course, subject to "a few specifically established and well-
delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). For instance, a "knock
and talk" constitutes a "consensual encounter and therefore does not contravene the Fourth
Amendment, even absent reasonable suspicion." *United States v. Cruz-Mendez*, 467 F.3d 1260,
1264 (10th Cir. 2006).

I.      *The Defendant Was Seized Inside His Home*

Although the United States does not explicitly argue that the initial encounter developed
from a "knock and talk," I find the record substantiates the encounter at least originated as such.
"Knock and talks" are a common police tactic used by officers to make an investigatory inquiry
at a home of a suspect or an individual with information about an investigation. *Id.* Sheriff
Shepperd testified that he originally approached Defendant's residence to inquire about
suspicious activity at 819 Carrizo Canyon Road.

A "knock and talk" encounter, however, is no longer consensual once an officer creates a
show of force, makes demands on the occupant, or otherwise creates the impression that the
occupant's compliance is required. *United States v. Reeves*, 524 F.3d 1161, 1166 (10th Cir.
2008). Deputy Kennedy's actions clearly demonstrate more than a show of authority. It was a
show of force. Immediately upon seeing Defendant inside the home, he pointed his shotgun at
Defendant and ordered him to "open the door." Any belief Defendant may have had that he was
free to not answer his front door quickly disappeared when he observed Deputy Kennedy

pointing his shotgun at him and commanding him to open the door.  And Defendant reasonably believed he must comply.  Deputy Kennedy's actions transformed what was initially supposed to be a "knock and talk" into a non-consensual encounter.

Having found this encounter to be non-consensual, the inquire may stop there.  Under the circumstances of this case, however, it is worthwhile to examine this seizure more expansively. "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

The Court must also consider several factors in determining whether an individual has been seized, including, (1) whether an officer advised an individual that he is free to leave, (2) the brandishing of a weapon by an officer, (3) aggressive language or tone of voice by an officer indicating compliance is compulsory, (4) interaction in a small, enclosed, or non-public place, (5) absence of other members of the public, (6) the threatening presence of several officers, (7) physical touching by an officer, (8) prolonged retention of a person's personal effects, and (9) a request to accompany the officer to the police station.  *United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010) (citations omitted).

"Where a motion to suppress evidence is heard, the credibility of the witnesses and the weight to be given the evidence, together with inferences, deductions, and conclusions fairly and reasonably to be drawn from the evidence, are to be determined by the trial judge." *United States v. Rios*, 611 F.2d 1335, 1344 n.13 (10th Cir. 1979) (citations and quotations omitted); *see also United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002) ("When reviewing a district court's denial of a motion to suppress evidence, we accept the district court's factual findings

12

and determinations of witness credibility unless they are clearly erroneous.") (citations and quotations omitted).

Defendant argues that he was unlawfully seized when Deputy Kennedy pointed the shotgun at Defendant through the kitchen window and ordered Defendant to open his door because no reasonable person would feel free to decline Deputy Kennedy's order. The United States counters by arguing that, under the totality of the circumstances, Defendant was not seized because the encounter occurred in the afternoon and, based on Defendant's criminal history, Defendant knew he did not have to comply with Deputy Kennedy's order. Tr. at 128.

I find *United States v. Reeves*, 524 F.3d 1161, and *United States v. Flowers*, 336 F.3d 1222 (10th Cir. 2003), applicable here. In *Reeves*, several police officers went to the defendant's motel room around 3:00 a.m., without a warrant, to question the defendant about a sexual assault that had occurred earlier that evening. 524 F.3d at 1164. The officers, at first, only requested the motel manager make multiple calls to the defendant's room. *Id.* When the defendant was nonresponsive, the officers repeatedly knocked on the defendant's motel door and window with their department issued flashlights for approximately twenty minutes while yelling, and identifying themselves as police officers. *Id.* The defendant eventually came to the door and stepped out of his motel room, at which point, the officers observed a side holster and took the defendant into custody. *Id.* at 1164-65. The Tenth Circuit found the officers' actions were effectively a command to open the door, and, accordingly, "would lead a reasonable person to believe that he was not free to ignore the officers." *Id.* at 1168.

In *Flowers*, two officers suspected the defendant was selling liquor and other illegal paraphernalia from his home. 336 F.3d at 1224. The two officers approached defendant's front door and knocked. *Id.* The defendant asked from behind the front door, "what do you want?"

*Id.*  One of the officers inquired about purchasing alcohol, to which the defendant answered affirmatively and offered a bottle of alcohol to the officers through a hole in the wall of the defendant's home.  *Id.*  An officer then said to the defendant, "in a firm tone of voice, 'Tulsa Police Department, open the door.'"  *Id.*  The Tenth Circuit found that a reasonable person, confronted at night and commanded to open the door, would have believed that he had to submit to the show of authority.  *Id.* at 1226 n.2.  Such a show of authority, the Court concluded, resulted in the unlawful seizure of the person as the individual's decision to open the door was not made voluntarily.  *Id.*

Deputy Kennedy's show of authority, however, exceeded even those of the officers in both *Reeves* and *Flowers*.  He pointed his shotgun at Defendant through the kitchen window and loudly and firmly ordered him to "open the door."  Under the totality of the circumstances, a reasonable person, confronted by an officer pointing a shotgun at him through a window in his home followed by a command to open his front door, would have believed that he had no choice but to open the door and submit to the show of authority.  Consequently, I find that when Defendant opened "his door he did so in response to a show of authority by [Deputy Kennedy] and he was seized inside his home."  *Reeves*, 524 F.3d at 1169.   Indeed, I find Defendant responded to a show of force.

The United States attempts to distinguish *Reeves* and *Flowers*, asserting, among other things, the incident in this case occurred in the daytime and Sheriff Shepperd knocked on Defendant's door for a matter of seconds.  In view of the facts and circumstances in the instant case, I find these distinctions non-controlling and unpersuasive.

Deputy Kennedy indeed may have been startled when Defendant suddenly appeared at the window, and he may have reacted as such.  But the relevant question is not what Deputy

14

Kennedy reasonably believed.  The relevant question instead is what a reasonable person believed—to wit, whether he had no choice but to answer the door.  *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (inquiry is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  Once Defendant answered the front door due to Deputy Kennedy's show of authority and direct order, Defendant was seized inside his home.

II.     *Defendant's Seizure Was Unlawful*

"Officers may enter an individual's home without consent and conduct a warrantless arrest if both probable cause and exigent circumstances exist."  *Reeves*, 524 F.3d at 1169 (citing *Payton v. New York*, 445 U.S. 573, 590 (1980)).   I find neither here.

Whether probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted).  Reasonable suspicion, however, does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  Although the Court gives deference to a law enforcement officer's ability to distinguish between innocent and suspicious actions, it must also keep in mind that "inchoate suspicions and unparticularized hunches do not provide reasonable suspicion."  *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998) (quotations omitted).

In its briefing and at the evidentiary hearing, the United States understandably did not argue that the warrantless search was supported by probable cause.  And the evidence does not support a finding of probable cause.  Indeed, the Lincoln County Sheriff's Office had only a tip that Ramos, a known and extremely violent fugitive, was hiding in 819 Carrizo Canyon Road,

the house adjacent to Defendant's residence, 821 Carrizo Canyon Road.

Furthermore, Sheriff Shepperd testified that he decided to question the occupants at Defendant's residence because he had a "hunch" that Ramos may be concealing himself within 821 Carrizo Canyon Road.  Tr. at 20, 46.  A hunch by itself does not rise to reasonable suspicion—let alone probable cause—that Ramos was in 821 Carrizo Canyon Road to justify a warrantless seizure of Defendant in his home.  *Salzano*, 158 F.3d at 1111.   The tip related to a potentially dangerous individual possibly located at 819 Carrizo Canyon Road.  There is insufficient evidence connecting 821 Carrizo Canyon Road to 819 Carrizo Canyon Road.[4]  I am not persuaded that next-door physical proximity between the houses amounts to exigency and, more specifically, to cause any of the officers to believe Ramos was in 821 Carrizo Canyon Road.  Notably absent from the evidence is any evidence Ramos fled from 819 Carrizo Canyon Road into 821 Carrizo Canyon Road, or even any other reliable indication he was being harbored inside 821 Carrizo Canyon Road.  I find unpersuasive the testimony referencing a dog that ran from 819 Carrizo Canyon Road to 821 Carrizo Canyon Road being similar to a breed of dog impounded from Ramos' home days or weeks earlier as sufficient to connect the two residences for probable cause purposes.  Viewing these facts in the totality of the circumstances and in light most favorable to the United States, I conclude there was no probable cause to justify a warrantless seizure or search.

I also conclude there were no exigent circumstances to justify a warrantless search.  The tip Deputy Rains received related to 819 Carrizo Canyon Road and not 821 Carrizo Canyon Road.  Deputy Kennedy testified that he did not know why Sheriff Sheppard ordered him to accompany Sheriff Shepperd to Defendant's residence.  Tr. at 62.  Deputy Kennedy stated that

---

[4]  There was no evidence presented relating to the specific details of the tip or whether the tipster was known to be reliable for Sheriff Sheppard or anyone in his team to believe Ramos was located not only in 819 Carrizo Canyon Road, but possibly inside 821 Carrizo Canyon Road.

he knew there was a search warrant for 819 Carrizo Canyon Road, but at the time, he had no information regarding Defendant's residence when he approached it. *Id.* at 61-62, 71. Deputy Kennedy only assumed that they were approaching Defendant's home to look for Ramos. *Id.* at 71.

Moreover, when Deputy Kennedy arrived on scene, the activities of the other officers, including Sheriff Shepperd, were not consistent with an active search of a known violent fugitive. Indeed, the evidence suggests the danger had dissipated by the time Sheriff Shepperd turned his attention to 821 Carrizo Canyon Road. Sheriff Shepperd testified that he holstered his sidearm as he approached Defendant's home and the video-audio evidence demonstrates that the other officers were conducting only a cursory search of 819 Carrizo Canyon Road. Under these circumstances, a reasonable conclusion for Deputy Kennedy to draw at that time was that Sheriff Shepperd was conducting no more than a "knock and talk" at Defendant's residence. Consequently, it was unreasonable for the officers to conclude that a violent fugitive was hiding inside Defendant's home such as to give rise to exigent circumstances. Based on the foregoing, I conclude Defendant was unlawfully seized in his home in violation of the Fourth Amendment.

III.    *Defendant's Consent Was Not Free and Voluntary*

When the validity of a search or seizure is based on consent, the United States bears the burden of showing that the consent "was freely and voluntarily given." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). The United States must show that under the totality of the circumstances Defendant's consent was voluntarily and freely given. *United States v. Drayton*, 536 U.S. 194, 207 (2002).

Moreover, when a consensual search follows a Fourth Amendment violation, the United

States must also prove, "from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent." *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996) (quotation and citation omitted). "This is a heavy burden." *Fox*, 600 F.3d at 1259.

There are three factors the Court must analyze to determine whether the taint of the earlier unlawful seizure has dissipated:  (1) the temporal proximity of the illegal seizure and consent; (2) "the presence of intervening circumstances;" and (3) particularly, "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

Defendant contends that when viewed under the totality of the circumstances, his consent was not free and voluntary.  Specifically, Defendant argues that Deputy Kennedy's show of force violated Defendant's Fourth Amendment rights and that his consent to search was thereby tainted by this constitutional violation.  In response, the United States concedes the evidence might not support attenuation because the temporal proximity between the illegal seizure and Defendant's consent was a matter of minutes.  Tr. 129-30.  The United States, however, asserts that the calm and civil conversation between Sheriff Shepperd and Defendant acted as an intervening circumstance.

First, the evidence relating to the temporal proximity weighs heavily against finding the taint cleansed.  Specifically, the video and audio evidence reveal that only sixty-one seconds elapsed between the time Deputy Kennedy yelled, "Hey, open the door" with his shotgun raised at Defendant and when Defendant agreed to the search.  *See Fox*, 600 F.3d at 1260 (holding that "close temporal proximity weighs against finding of attenuation") (citing *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994) (taint of initial violation not purged "where defendant consented 'only a few minutes after being illegally detained'")); *see also United States*

18

*v. Fernandez*, 18 F.3d 874, 883 (10th Cir. 1994) (consent tainted by unlawful seizure when only "moments" passed between seizure and consent).  Thus, the temporal proximity factor indicates that Defendant's consent to search his home was not an independent act of free will.

Second, "there must be proof of facts or events which ensure that the consent provided . . . [was] not the fruit of the illegal [seizure].  The facts or events must create a discontinuity between the illegal [seizure] and the consent such that the original illegality is weakened and attenuated."  *Fox*, 600 F.3d at 1260.  Several examples of intervening circumstances are, (1) "carefully explaining a consent form and advising an individual of the right to withhold consent," (2) release from custody, (3) consultation with an attorney, or (4) an appearance before a magistrate.  *Id.* at 1261.  Additionally, an individual's "consent is not in itself an intervening event which could remove the taint of the prior illegal seizure."  *Id.* at 1260 (citing *Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994)).

In the present case, there are no intervening circumstances that served to remove the taint of the initial Fourth Amendment violation.   Indeed, it is difficult to imagine that significant changes in circumstances could arise in a mere sixty-one seconds.  To the extent they could, the evidence here is that they did not.  And while I find the minimal temporal proximity telling, I find the conduct occurring on the porch more so.  The events between the unlawful seizure and Defendant's consent are unbroken and continuous.

For example, Sheriff Shepperd asked for Defendant's consent at least one other time after the unlawful seizure and before Defendant's recorded consent.  In addition, at no time was Defendant told he had a right to withhold consent.  None of the officers reviewed a consent form with Defendant prior to the search.  *Mendenhall*, 446 U.S. at 558-59 (knowledge of right to withhold consent "highly relevant" in determining whether consent voluntary).  Defendant was

19

never released from custody prior to consenting. Although the exchange between Sheriff
Sheppard and Defendant appear and sound calm and civil, the immediate circumstances strongly
suggest otherwise. The evidence clearly illustrates that just as Sheriff Shepard is asking for
Defendant's consent, Deputy Kennedy was standing only a few feet away pointing his shotgun
for several seconds in the direction of Defendant. All the while, several uniformed, armed
officers were positioned on or immediately around the porch where Sheriff Sheppard engaged
Defendant. Based on the totality of surrounding circumstances, a reasonable person could not
reasonably conclude that he was not free to terminate the encounter and refuse the request to
search. And the officers could not have reasonably expected this encounter and the consent
given to have been free and voluntary. Accordingly, I conclude that there was "no break in the
causal connection" between the initial seizure and Defendant's consent. *Melendez-Garcia*, 28
F.3d at 1053.

Third, the evidence of flagrancy and purposefulness of official misconduct also weighs
against a finding the taint was cleansed. The United States claims that Deputy Kennedy acted in
good faith in accordance with *United States v. Leon*, 468 U.S. 897 (1984), due to a reasonable
fear that Ramos, a violent fugitive, was hiding within Defendant's residence. The flagrancy and
purpose of Deputy Kennedy's conduct weighs toward suppression. To determine whether the
officer's misconduct was flagrant or purposeful, the Court looks to whether: "(1) the
impropriety of the official's misconduct was obvious or the official knew, at the time, that his
conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was
investigatory in design and purpose and executed in the hope that something might turn up."
*Fox*, 600 F.3d at 1261. The Court may also consider whether "the officers had no right
whatsoever to detain the person from whom consent is sought." *Id.*

Here, the record supports a finding that Deputy Kennedy should have known that his conduct was likely unconstitutional, and, therefore, flagrant.  As addressed earlier, Deputy Kennedy knew that Sheriff Shepperd did not have an arrest warrant or search warrant for Defendant's residence.  *See supra* Part II.  In the absence of a search warrant, Deputy Kennedy's conduct would not violate the Fourth Amendment if probable cause and exigent circumstances existed.  As noted above, I find the officers had neither.  *See id.*  Moreover, while it is understandable that Deputy Kennedy may have been startled, this does not indicate that his actions were the result of good faith or negligence, especially when considering Deputy Kennedy continued to point his shotgun toward Defendant as he stood on the porch.  *Leon* is inapplicable because Deputy Kennedy did not rely upon a facially valid warrant or on a mistake made by another officer.  *See United States v. Leon*, 468 U.S. 897, 922 (1984) ("evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" will not be suppressed); *United States v. Herrera*, 444 F.3d 1238, 1249 (10th Cir. 2006) (*Leon* "applies only narrowly, and ordinarily only when an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer.").  Under these circumstances, Deputy Kennedy should have known that pointing a shotgun at an individual who is inside his home, and ordering the individual to open the door under color of authority and with show of force, is a violation of the Fourth Amendment.  *See Reeves*, 524 F.3d at 1167; *see also Illinois v. Krull*, 480 U.S. 340, 348-49 (1987) ("[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or *may properly be charged with knowledge*, that the search was unconstitutional under the Fourth Amendment.") (emphasis added).

Additionally, the totality of the surrounding circumstances indicate that Deputy Kennedy's conduct was investigatory in design, purpose, and executed in the hope of turning up

information about Ramos' whereabouts.  On the day of the incident, Deputy Kennedy was called to 819 Carrizo Canyon Road to assist with a search warrant for Ramos.  When Deputy Kennedy arrived on scene, Sheriff Shepperd called over the radio, "Kevin, come up here there's a two story house."  Gov't Ex. 11 at 10:13-10:14.  Deputy Kennedy assumed that he and Sheriff Shepperd were going to the two story house, Defendant's residence, to look for Ramos.  Tr. at 71.  At the suppression hearing, Deputy Kennedy testified that he ordered Defendant to open the door so that Defendant would comply with the command.  *Id.* at 73-74.  These circumstances strongly imply that Deputy Kennedy seized Defendant with a "quality of purposefulness" to attain information regarding Ramos' whereabouts.  *Fox*, 600 F.3d at 1262 (quoting *McSwain*, 29 F.3d at 563).

Finally, as noted earlier, there is no evidence in the record that probable cause existed at the time Defendant was seized.  Accordingly, the officers had no lawful basis to seize Defendant within his home absent a warrant or probable cause and exigent circumstances.

I, therefore, find that from the totality of the circumstances, including the three *Brown* factors, there was no break in the causal connection between the illegal seizure of Defendant and Defendant's consent to search his residence.  Thus, the exclusionary rule applies, and any evidence seized from Defendant's residence must be suppressed as fruit of the poisonous tree. *Fernandez*, 18 F.3d at 881.

Assuming *arguendo* Defendant was not seized within his residence, Defendant's consent, nevertheless, was not free and voluntary.  In addition, the evidence demonstrates Defendant subsequently withdrew his consent.  The video evidence undeniably illustrates that, for a couple moments prior to Defendant's consent, Deputy Kennedy held his shotgun with the barrel parallel to the floor and in the immediate direction of Defendant.  Gov't Ex. 11 at 12:08-12:10.

22

Defendant testified, and the video evidence corroborates, that Defendant observed Deputy

Kennedy point the shotgun in his direction when Sheriff Shepperd asked to search the premises.

Tr. 114-15; Gov't Ex. 11 at 12:07-12:13.  As discussed *supra*, under the totality of the

circumstances, Defendant's consent was no more than acquiescence to Deputy Kennedy's show

of force.  *Bumper*, 391 U.S. at 548-49.  Once the officers entered Defendant's residence, any

evidence observed in plain sight, *i.e.* the sawed off shotgun, was fruit of the poisonous tree

because the officers were not lawfully present in Defendant's home.  *Cf. Coolidge v. New*

*Hampshire*, 403 U.S. 443, 466-67 (1971) (seizure of evidence in plain view is lawful if officer

has legitimate reason for being present).

The evidence is also clear that, shortly after the search began, Defendant questioned the

officers' authority to search his home.  When Defendant realized that the officers did not possess

a search warrant, Defendant withdrew his consent when he told Deputy Rains and Sheriff

Shepperd, "I never said a damn thing [about consenting to a search]," Gov't Ex. 10 at 17:32-

18:26; Gov't Ex. 11 at 18:09-8:12, and that anything he said was because there was a shotgun

pointing at his head.  Gov't Ex. 10 at 17:46-17:49; Gov't Ex. 11 at 18:20-18:26.  Despite

Defendant's withdrawal, Deputy Rains and Sheriff Shepperd failed to communicate this

important fact to other members of the law enforcement team, including Deputy Christian.  Nor

did any of the officers leave the premises.  *Manzanares v. Higdon*, 575 F.3d 1135, 1143, 1147

(10th Cir. 2009) (it is well established that search should terminate and officers should vacate

home immediately upon revocation of consent absent independent legal authority, such as search

warrant or exigent circumstances).

Although Deputy Christian testified on cross-examination that the video evidence

confirmed that Deputy Christian walked past Defendant when he revoked consent, Deputy

Christian did not explicitly testify that he heard the withdrawal of consent.  Tr. 96-97.   It is

clear, however, from the video and audio evidence that Deputy Christian was within close

proximity to Defendant the moment Defendant withdrew consent.  The evidence shows that

Deputy Christian reentered the upper level of the home when Sheriff Shepperd stated, "I asked if

I could search here for Ramos," and Defendant quickly revoked consent stating, "I never said a

damn thing."  Gov't Ex. 11 at 18:09-8:12; Gov't Ex. 10 at 17:36-17:39.  It is also clear from the

evidence that Deputy Christian walked past Defendant when Defendant said, "when you got

someone pointing a gun at you, yeah you do [consent]."  Gov't Ex. 11 at 18:20-18:23; Gov't Ex.

10 at 17:46-17:49.   Viewing the record in light most favorable to the United States, I find that

Deputy Christian did not hear Defendant withdraw his consent.  Deputy Christian continued to

search the residence, and he located marijuana, the purported basis for the probable cause to

support the subsequent search warrant.[5]   Nonetheless, whether Deputy Christian heard or did not

hear Defendant's revocation does not affect the conclusion that all officers were required to

promptly leave Defendant's home upon Defendant's withdrawal of consent, and, absent exigent

circumstances, Deputy Christian was required to cease searching the residence.  A different

conclusion would result in validation of officer conduct that, in a separate but similar context,

purposefully avoids informing all members of a search and that is designed to achieve a

purported good faith seizure of evidence by the uninformed members.

        The evidence further demonstrates that there were no exigent circumstances to justify

Deputy Christian's search.  His search of the upper and lower levels of the home and the

activities of the other officers in and around the home are not consistent with a search of a

---

[5]  The search warrant was not offered in evidence as an exhibit.  However, when asked, the United States agreed the discovery of the marijuana inside a cabinet of the residence served as the basis for the search warrant obtained later in the investigation, Tr. 138, and that later resulted in the discovery of the methamphetamine in the residence.  Tr. 84.

presumed violent fugitive who, it was believed, was carrying an AK-47 and accompanied by an equally violent bodyguard.  For instance, the officers' sense of urgency displayed during the search of 819 Carrizo Canyon Road significantly, if not entirely, dissipated when the officers stopped searching 819 Carrizo Canyon Road.  Specifically, of the six officers on scene, only two officers attempted to clear Defendant's residence, a two-story home, while at least three officers actively participated in the prior search of 819 Carrizo Canyon Road, a one-story home.  Gov't Ex. 11.  Sheriff Shepperd completed his search of the upper level in less than a minute, and during that time did not brandish his firearm.  *Id.* at 12:13-13:10, Tr. at 39.  Prior to clearing Defendant's residence, at least four officers either placed their weapons in a low-ready position or holstered their weapons.  Gov't Ex. 11 at 12:13-19:47.  At one point, the video evidence shows an unidentified officer standing on the side of Defendant's home casually tending to a dog.  Gov't Ex. 11 at 15:11-15:25.  The unidentified officer is not brandishing a weapon.  *Id.*  While attempting to search for an entrance to the lower level, Deputy Christian participated in jovial banter with Deputy Kennedy and an unidentified officer, demonstrating a relaxed atmosphere.  *Id.* at 15:26-15:28.  Under these circumstances, it is difficult to find that a reasonable officer would conclude that a dangerous fugitive possibly was hiding somewhere in Defendant's home and giving rise to an exigency.

It is undisputed that Defendant's consent limited the object of the search to a person, Ramos.  *See Manzanares*, 575 F.3d at 1143 (consensual searches are limited by scope of consent).  As addressed above, the atmosphere and the officers' demeanor were not consistent with a search for an armed violent fugitive to a search that demonstrated no urgency to clear Defendant's home.  Upon entering Defendant's residence, at least one officer commented that the house "smells like dope."  Gov't Ex. 10 at 13:01.  Significantly, immediately after Deputy

Christian commenced his search he looked in small containers, on open shelving units, and in a kitchen lower corner cabinet. Gov't Ex. 11 at 16:50-19:47. In his search, Deputy Christian discovered ammunition, marijuana, and digital scales. Deputy Christian's actions exceeded the scope of the search. The evidence demonstrates, and a reasonable officer would conclude, that a person could not or would not conceal himself in small containers or on clearly open shelving units. Additionally, Deputy Christian testified that he searched the kitchen double-door cabinet because, based on his training and experience, a person could hide in such an area. Tr. 100. The evidence, however, clearly illustrates that Deputy Christian searched a lower corner single door cabinet, in which it would be difficult for an individual to conceal himself.[6]

For the aforementioned reasons, I find Defendant's consent, under the circumstances, was not voluntarily and freely given. I also find Defendant withdrew consent prior to Deputy Christian's subsequent search of Defendant's kitchen. I further find that even though Deputy Christian did not hear Defendant revoke consent, exigent circumstances were not present to support Deputy Christian's search of the residence. In addition, I find Deputy Christian's search exceeded the scope of Defendant's consent to search for a person, Ramos. Accordingly, Defendant's constitutional rights were violated when Deputy Kennedy demonstrated a show of force to receive Defendant's consent, that after Defendant revoked consent Deputy Christian continued to search the residence after he should have stopped, and when Deputy Christian's search exceeded the scope of Defendant's consent. I, therefore, conclude the evidence discovered in plain sight—sawed off shotgun; the evidence discovered and that served as the

---

[6] At the suppression hearing, Deputy Christian testified that he continued to search Defendant's home for the purpose of looking for Ramos. Tr. 82-83. The evidence, however, suggests the scope of Deputy Christian's search exceeded the scope of Defendant's consent. *See* Gov't Ex. 11 at 12:13-20:27. Indeed, Deputy Christian admits as much by testifying that he discovered the ammunition while searching an open shelving unit, where if Ramos was present he would have been clearly visible. Tr. 95. Although the evidence and Deputy Christian's testimony raise inconsistencies, I decline to make any credibility determinations.

basis for probable cause in support of the search warrant—marijuana; the evidence discovered as a result of the search warrant—methamphetamine; and the evidence discovered outside of the scope of the search—ammunition; were sufficiently tainted by Deputy Kennedy's show of force and Deputy Christian's unlawful search, and, thus, are excluded as fruit of the poisonous tree.

<u>CONCLUSION</u>

On January 8, 2014, absent a warrant or probable cause and exigent circumstances, Deputy Kennedy unlawfully seized Defendant in his home when Deputy Kennedy pointed his shotgun at Defendant through Defendant's kitchen window and ordered Defendant to open the front door of his residence.  In response to Deputy Kennedy's order, Defendant immediately opened his front door and stepped onto his porch.  Approximately sixty-one seconds after Deputy Kennedy ordered Defendant to open his door, Defendant consented to a search of his residence.  The minute temporal proximity between the time Defendant was unlawfully seized and consented, plus the lack of any intervening circumstances supports the finding that taint of the unlawful seizure did not dissipate prior to Defendant's consent.  Moreover, Deputy Kennedy's conduct was sufficiently flagrant to warrant the application of the exclusionary rule because Deputy Kennedy should have known that, under the circumstances, his misconduct was unconstitutional, but engaged in it nevertheless.  Additionally, Deputy Kennedy exhibited a quality of purposefulness to ensure Defendant opened the door.  Defendant's Fourth Amendment right to be free from seizure within the home were violated and, based on the totality of the circumstances, there was not significant attenuation to remove the taint of the constitutional violation prior to Defendant's subsequent consent.

Furthermore, assuming *arguendo* that Defendant was not seized within his home, moments prior to Defendant's recorded consent, Deputy Kennedy's show of force nevertheless

terminated the consensual encounter.  Defendant's subsequent consent was not an act of free

will.  Defendant withdrew his consent shortly after the officers entered the home.  All of the

officers, including Deputy Christian, were then required to leave Defendant's home, absent

exigent circumstances.  In addition, the evidence clearly illustrates that exigent circumstances

were not present to support a search for Ramos in Defendant's home.  Moreover, Deputy

Christian's search exceeded the scope of Defendant's consent when Deputy Christian searched in

areas where an individual could not conceal himself.  For these reasons, Defendant's consent was

not voluntarily or freely given, and, therefore, the officers' entry into Defendant's home and

subsequent search violated Defendant's Fourth Amendment rights.  Based on my Findings of

Fact and Conclusions of Law herein set forth, I grant Defendant's Motion to Suppress.

IT IS, THEREFORE, ORDERED that Defendant's Motion to Suppress (Doc. 53) is

GRANTED.

UNITED STATES DISTRICT JUDGE